Laughlin vs. Greene.

No. 54.—John O. Laughlin, administrator of Thomas Laughlin, plaintiff in error, vs. James D. Greene, executor of Thomas Wilkins.

[1.] If the answer of a defendant in Equity springs out of the allegations in the bill, and its statements stand connected in substance with the subject matter of the allegations, although not literally and directly responsive they are to go to the Jury as evidence for the defendant, for as much as they may be worth.

[2.] A new trial will not be granted upon the ground that the verdict was contrary to evidence, when there is any evidence to support the finding.

In Equity, from Columbia Superior Court. Motion for new trial. Decided by Judge Starnes, at Chambers, 24th May, 1853.

The plaintiff in error filed his bill in the Superior Court of Columbia County, against the defendant, the executor of Thomas Wilkins, averring that Thomas Laughlin, his intestate, departed life in Chatham County some time about the year 1794, leaving a considerable real and personal estate, and two sons, the complainant and one Thomas Laughlin, and his widow, Sarah H. L., his heirs at law; that about the year 1796, the said Sarah H. L. intermarried with Thomas Wilkins, and that the said Thomas took into his possession the estate of said Thomas Laughlin, consisting of negro slaves and other personal property, and removed to the County of Columbia, where he resided until his death, in the use and enjoyment of said property, having sold certain portions of it, and invested the proceeds; that Wilkins died about the year 1847, and left a will, by which the defendant, Greene, was appointed executor, and that he was qualified and took into his possession, as part of the estate of Wilkins, certain slaves, (named in the bill,) who are averred to be the remnant of the negroes originally belonging to Thomas Laughlin, at the time of his death, or their issue and increase, or purchased with the proceeds of those sold; that no administration was ever taken out on the

estate of Thomas Laughlin, until the year 1849, when administration was granted to the complainant; that the brother of complainant, the other son of Laughlin, has not been heard of for many years, and is dead; that during the life of Wilkins, complainant applied to him for some account of his father's estate in his hands, but was told and put off with the promise, that he should have an equal share of all Wilkins' estate with the children of Wilkins, at his death, but that this promise has not been complied with. The defendant is required to answer to the best of his knowledge, information and belief, "when and where the said Laughlin died, what estate he left, and what portion thereof, describing it, came into the hands and possession of Thomas Wilkins, upon his marriage with Sarah H. Laughlin, and what disposition he made of the same?" &c. The bill contains the usual prayer for account.

To this bill the defendant answered, and upon the trial of the cause, certain portions of the answer were objected to by complainant, as evidence, as not being responsive to the allegations of the bill. The Judge admitted them to be read for the consideration of the Jury, subject to the rules governing evidence in Chancery cases. The portions of the answer thus objected to, and upon the admission of which as evidence, error is assigned to this Court, are as follows : "That as to the property left by said Laughlin at his death, this defendant can or does know nothing, only from the following circumstances : He was well acquainted with Thomas Wilkins, who, after the death of. Thomas - Laughlin, married his widow; that for many years after this marriage, this defendant, of his own intimate and personal knowledge, states that the said Wilkins and wife were in the most indigent circumstances ; that said Wilkins used to carry his corn to mill on his back, such was his destitution of means, that he was not able to own a horse ; that such was his abject penury, that he used to go from house to house through the community in which he lived, to work out by the day, at any and all kinds of labor; that he has known him to split rails by the day, work on farms, &c. ; that there is no negro named in said will that Wilkins did not purchase

with his own money, and that they were not purchased with moneys raised from the estate of Laughlin, as this respondent verily believes said Laughlin left no estate of any kind except old Sambo, that was sold as above mentioned, to pay the debts of said Laughlin, deceased, and that the proceeds of the sale were not sufficient for that purpose, and that the estate of said Laughlin, deceased, was in fact reputed to have been insolvent, and to the best of respondent's information, was insolvent at his death." Other portions of the answer admitted to be responsive, and included within the lines marked by the Judge, own that to the best of the information and knowledge of respondent, none of the estate in his hands ever did belong to Thomas Laughlin, or was purchased with funds derived from that estate.

The complainant introduced testimony as follows:

1st. The letters of administration on the estate of Thomas Laughlin, deceased, granted on the 5th November, 1849, by the Court of Ordinary of Chatham County.

2d. The admissions in defendant's answer, as to the place and time of the death of Thomas Laughlin, and of its being " well nigh a quarter of a century since a man bearing the name of complainant was last heard of."

3d. The testimony of Sarah H. Wilkins, who proved—that Thomas Laughlin died on Gov. Telfair's plantation, Back river, S. C., in the year 1796; that she (widow of said Thomas) married Thomas Wilkins in 1798; that complainant is the son of Thomas Laughlin; that he has lived in Columbia, Hancock and Chatham; has led a roving life, and been absent at one time about eighteen years. That her husband, Thomas Laughlin, left three negroes, Sambo, Sucky and Alcy, which came to the possession of her second husband, Wilkins; also, household and kitchen furniture; the negroes worth about fourteen hundred dollars—the girls hired at one dollar per week each, and the man at ten dollars per month. That her second husband disposed of said slaves, as well as the other property left by the said Thomas Laughlin.

4th. The testimony of John Bynum, who proved—that in

HARVARD LAW SCHOOL LIBRARY

1826 or 1827, Thomas Wilkins told him that John O. Laughlin had been to see him and threatened to sue him for said John's portion of his father's estate; that he (Wilkins) thought he and his wife had compromised with said John, by agreeing to put him on equal footing with his (Wilkins') two children, at his death; that in 1845 Wilkins spoke to witness, and asked him if he remembered what he told him (in 1826 or 1827,) repeating it. Witness said he did, and asked him (Wilkins) if he intended to stand up punctually, as Laughlin had done. Wilkins answered that he would, that he was a punctual man. Wilkins stated in the first conversation that there had been no administration on the estate of Thomas Laughlin.

5th. The last will and testament of Thomas Wilkins, proved in 1847, in which no provision was made for complainant.

The defendant offered no evidence, but relied on certain portions of his answer, (marked with ink by the Judge,) decided by the Court to be testimony for him, to be received subject to the rules of evidence in Equity cases, to which the attention of the Jury was called in the charge. This charge was, " that the answer of the defendant, responsive, &c. was evidence for him, unless contradicted by two witnesses, or one witness with corroborating circumstances, but this rule was applicable to what the defendant states of his own knowledge. If he states what, in the nature of things, he could not know, he must do it upon information or report, and this need not be so contradicted. If he so answer, as it is insisted he does answer in this case, that from his own knowledge, no property came to the possession of Wilkins from the estate of Laughlin, in 1796, and, in the opinion of the Jury, this could not be known to him, and he must only have information thereof, then they cannot give weight and credit to the answer, as responsive to the bill, but must look to the other evidence to this point.

The Jury having found a verdict for the defendant, counsel for complainant moved for a new trial, upon these grounds:

1. That the verdict was contrary to law.

2. That the verdict was contrary to evidence.

3. That the Court erred in deciding and charging the Jury,

that the portions of defendant's answer marked with ink, were responsive to complainant's bill, and evidence for defendant.

Upon the argument of this motion, Judge STARNES refused to grant a new trial upon this, among other reasons: that there was evidence on both sides of the case, and even, *ex gratia*, conceding that some evidence had been improperly admitted, it did not materially affect that which had been (confessedly) properly admitted.

Upon this refusal to grant a new trial, error is assigned to this Court.

A. J. & T. W. MILLER, for plaintiff in error.

A. H. H. DAWSON, for defendant in error.

*By the Court.*—NISBET, J. delivering the opinion.

[1.] The assignment mainly relied upon in this case is, that the presiding Judge erred in deciding and instructing the Jury, that the designated portions of the answer were evidence to be by them considered in making up their verdict. It is claimed that they are not evidence, because not responsive to the bill. The question, therefore, is, are they responsive to the bill? No Chancellor has laid down a rule so comprehensive that all cases of this kind may be brought to its test. It is not to be expected that any such rule ever will be known to Courts of Equity. In the nature of the case it is impossible. Answers not responsive to the bill, are not evidence for the respondent. Whether responsive or not, the Chancellor must determine, according to the allegations and the character of the response. These may be different in each case from all others. Hence the impossibility of laying down an uniform rule. The answer must meet the substance and 'spirit of the allegation—if it falls short of this, it is liable to exception. And if it does spring out of the allegation, and its statements stand connected in substance with the subject-matter of the allegation, although not literally or directly responsive, it is to go to the Jury as

evidence for the defendant, for as much as it may be worth. Judging this case by these views, we conclude that the answer was responsive.    The bill charges, that upon the inter-marriage of the defendant's testator with the widow of the plaintiff's intestate, he came into possession of considerable property belonging to the estate of his (plaintiff's) intes-tate.    In the interrogatory part of the bill, the defend-ant is asked to say, according to his knowledge, information and belief, what property came to the possession of his testa-tor, Wilkins, upon his intermarriage with the widow of plain-tiff's intestate, (Laughlin,) and what disposition he made of it?    To which the defendant answers, that at the time of Wil-kins' intermarriage with the widow of Laughlin, and for a number of years afterwards, both he and his wife were in the most indigent circumstances; that Wilkins used to carry his corn to mill on his back, did not own a horse, and worked from house to house in the community as a day-laborer, split-ting rails, &c.    These answers are objected to as not being re-sponsive.

The statement that Wilkins was in indigent circumstances when he married the widow Laughlin, and for years afterwards, is not a direct answer to the question, "*what property came into his possession by the marriage?*" but it is an answer which springs out of it, and is connected with its subject-matter.    It inferentially negatives the charge, that upon his marriage he came into possession of property belonging to the estate of Laughlin.    If, at that time, he was possessed of no property, and had none for years afterwards, it is to be presumed that he acquired none by the marriage.    The inference is not con-clusive—its strength is to be determined by the Jury.    The facts stated, as that he carried his corn to mill on his back, &c., are part and parcel of the statement of indigence, and may be considered in the light of reasons given by a witness for his belief.    The other portion of the answer objected to is, "that there is not a negro named in the bill that he (Wilkins) did not purchase with his own money, and that they were not purchased with money raised from the estate of Laughlin, as

Laughlin *vs.* Greene.

this respondent verily believes said Laughlin left no estate of any kind, except old Sambo, that was sold to pay the debts of said Laughlin, and that the proceeds of the sale were not sufficient for that purpose, and that the estate of said Laughlin was, in fact, represented to have been insolvent, and to the best of deponent's belief was insolvent at his death." The defendant is required, as before stated, to answer, on his knowledge, information and belief. The bill charges, that Laughlin died possessed of considerable property, in which the complainant claims a distributive share, as heir. The statement of the answer, upon the belief of the defendant, that Laughlin died insolvent, is certainly responsive to that allegation. So are the statements that he left no property but old Sambo, who was sold to pay his debts, and that the proceeds of the sale were not sufficient for that purpose. The bill also names certain slaves, and charges that they belonged to the estate of Laughlin, and came into the possession of Wilkins, or that they were the issue of such negroes as belonged to his estate, or were purchased with the proceeds of the sale of negroes which belonged to that estate. Now, the answer averring that the negroes named in the bill, were purchased by Wilkins, with his own money, and that they were not purchased with money raised from the estate of Laughlin, is directly responsive to the last recited allegations. Our judgment is, that the parts of the answer objected to, were properly sent to the Jury.

[2.] There was some evidence to warrant the finding of the Jury, and the Court, for that reason, did right in refusing a new trial, on the ground that the verdict was contrary to evidence.

Let the judgment be affirmed.